UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -- x

UNITED STATES OF AMERICA           :                S1 07 Cr. 961 (KBF)

        - v. -                                :

DAVID NORMAN,                        :
    a/k/a "Jim Norman,"

                            :

             Defendant.

                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S SENTENCING MEMORANDUM


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America


Andrew Goldstein
Andrea Surratt
Assistant United States Attorneys
    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                          :

     - v. -                                              :          S1 07 Cr. 961 (KBF)

DAVID NORMAN,                                     :
     a/k/a "Jim Norman,"

                                :

                       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

     David "Jim" Norman is scheduled to be sentenced on Friday, July 12, 2013, at 10 a.m. This Court presided over the trial at which Norman was convicted by a jury, after a very brief period of deliberation, of conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349.  At trial, extensive documentary evidence, including dozens of emails from Norman to his victims, as well as testimony from numerous witnesses, including Norman himself, established the large, multi-year scale of Norman's advance fee fraud scheme; the truly egregious nature of his conduct, including his pernicious treatment of victims, whom he often defrauded repeatedly and attacked when they asked too many questions; his total lack of remorse; his willingness to lie on the witness stand in his own defense; and his continued commitment – even as the trial was ongoing – to carrying out the fraud against more and more victims.  This memorandum sets forth the Government's view of the applicable Guidelines range in this case – which, in light of the large loss amount and number of victims, his leadership role, and his obstruction of justice, calls for a sentence at the statutory maximum of 240 months'

imprisonment.  This memorandum further explains why, in light of the factors set forth in 18

U.S.C. § 3553(a), a Guidelines sentence is warranted.  Jim Norman is a master manipulator who

inflicted serious harm on well more than a hundred victims, has failed to admit or accept

responsibility for his criminal conduct, and is clearly a serious risk of reoffending upon his

release.

**I.       The Applicable Guidelines Range**

The Probation Office calculated the applicable Guidelines range as 210-240 months'

imprisonment, as follows:

Base offense level, pursuant to U.S.S.G. § 2B1.1: 7

Loss amount greater than $2.5 million, but not more than $7 million: +18

More than 50 victims, but less than 250 victims: +4

Offense committed from outside U.S./sophisticated means: +2

Vulnerable victim enhancement: +2

Leadership Role: +4

Total offense level: 37

With an offense level of 37, at Criminal History Category I, the resulting Guidelines range would

ordinarily be 210-262 months' imprisonment.  However, because the statutory maximum penalty

for the offense is 20 years' imprisonment, the effective Guidelines range as calculated by the

Probation Office is 210-240 months, pursuant to U.S.S.G. § 5G1.1(c)(1).

Norman contests the Guidelines analysis set forth in the PSR in four ways.  First, he asks

that the Court find that the loss amount was either (a) only $252,000, based on the direct

testimony of victims at the trial, or (b) between $1 million and $2.5 million, based on the limited

set of bank records that the Government introduced at trial.  (Norman Br. at 7-9).  Second, he asks that the Court find that there were only 13 victims of the fraud.  (Norman Br. at 9-10). Third, he asks the Court not to apply the vulnerable victim enhancement.  (Norman Br. at 11-13). Finally, he asks the Court not to apply an enhancement for his leadership role in the offense. (Norman Br. at 13).  Based on these proposed adjustments, Norman argues that the applicable Guidelines range is either 46-57 months, if the loss amount is $252,000, or 70-87 months, if the loss amount is between $1 million and $2.5 million.  (Norman Br. at 14).

As set forth below, the Government submits that the Probation Office was largely correct in its analysis of the Guidelines, with three exceptions.  First, the Government believes that the evidence at trial makes it clear that the loss amount was in fact greater than $7 million, as Norman himself testified.  As a result, the offense level should be increased by 20 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(K), as opposed to the 18-level increase set forth in the PSR. Second, the Government is seeking a 2-level enhancement for obstruction of justice, based on specific instances of Norman's perjury in his testimony at trial.  Third, the Government agrees with the defendant that, as a legal matter, the vulnerable victim enhancement pursuant to U.S.S.G. § 3A1.1(b)(1) likely does not apply here, although the deliberate means by which Norman took advantage of victims who were susceptible to his conduct, and the way he then went back to the same victims repeatedly, is relevant to the Court's consideration of the Section 3553(a) sentencing factors.

Accordingly, the Government submits that the correct calculation of the Guidelines range is as follows:

Base offense level, pursuant to U.S.S.G. § 2B1.1: 7

Loss amount greater than $7 million, but not more than $20 million: +20

More than 50 victims, but less than 250 victims: +4

Offense committed from outside U.S./sophisticated means: +2

Leadership Role: +4

Obstruction enhancement: +2

Total offense level: 39

Based on the above, the applicable Guidelines range would be 262-327 months' imprisonment. However, because the statutory maximum penalty is 240 months' imprisonment, the Guidelines range is a sentence of 240 months, pursuant to U.S.S.G. § 5G1.1(a).

Finally, it should be noted that the correct legal standard in determining the application of the Guidelines is preponderance of the evidence, and not, as Norman argues, beyond a reasonable doubt. There is no basis in law for Norman's argument – indeed, the Second Circuit has specifically rejected it. In *United States* v. *Salazar*, 489 F.3d 555 (2d Cir. 2007), the Second Circuit rejected an argument that *Booker* permits sentencing judges to apply the proof beyond a reasonable doubt standard to disputed sentencing issues. The Court held that "facts relevant to sentencing must be found by a preponderance of the evidence." *Id.* at 557. The Court further noted that Supreme Court and Second Circuit precedent "make[s] it clear that *Booker* has no effect on the standard of proof applicable to [judicial] fact-finding," and concluded "that the district court was required to use the preponderance of the evidence standard, as it did, in finding facts relevant to sentencing for Guidelines calculation purposes." *Id.* at 558.

A.    *Norman is Responsible for More than $7 Million in Loss*

-4-

As noted above, the parties disagree about the appropriate loss amount attributable to Norman.  Norman implausibly argues that he is responsible for only up to $2.5 million in loss (or even as low as $252,000) and, accordingly, argues that his base offense level should be enhanced by either 12 or 16 levels pursuant to U.S.S.G. § 2B1.1.  The Probation Department calculated Norman's loss amount as between $2.5 and $7 million and enhanced his base offense level by 18 levels.  The Government, however, contends that the conspiracy of which Norman was the undisputed leader was in fact responsible for a loss to victims of over $7 million and, as such, his base offense level should be enhanced by 20 levels pursuant to U.S.S.G. 2B1.1(b)(1)(K).  There are three sources of evidence that support this conclusion: (1) Norman's own testimony at trial; (2) bank records and other exhibits introduced at trial; and (3) the testimony of the Government's witnesses.

Norman testified at trial about how much money he personally raised from his "investors."  On cross-examination, the Government showed Norman an email that he had written to an FBI confidential informant (the "CI") who was posing as a potential investor.  In that email, Norman wrote: "But believe it or not, I have raised *over 9 million* with people that I have never met, REALLY, I can show you wire slips as I put this portfolio together over the years, slips for 110k, 100k, 90k, 55k, etc (really, not bragging, *9 million in*, 178 million out, TO DATE) . . . ."  (GX 522) (emphases added).  The Government asked Norman, referring to whether he had raised $9 million: "Is that true, is that statement true?"  (Tr. 840).  Norman responded: "Yes, it is, except the 9 million is sort of a round figure.  It could have been more, it could have been less, but the point was, it was a lot of money."  (*Id.*).  The Court then asked Norman a clarifying question: "When you said it could be more, it could be less, would [it] be

less than 8 million, or is it . . . 8-ish or above?"  Norman responded: "6 to 9.  I wish I had—."

The Court pressed Norman: "But at least 6 is to the best of your recollection?"  Norman replied:

"Yes, between 6 and 9."  Norman also clarified for the Court that when he said "178 million out,

to date," he did not mean that he had paid his victims $178 million.  (*Id.*).  In fact, Norman also

testified that not a single investor was paid their promised returns, although he did claim that

"two or three" of his investors got their original investment back.  (Tr. 898).  Thus, Norman's

own testimony – corroborated by an email he wrote to a potential investor before his arrest –

establishes that he stole between $6 and $9 million from his victims, and the email he wrote put

the number at the high end of that range: "over 9 million."

Based on this testimony and email exchange alone, the Court can reasonably conclude

that the loss amount was greater than $7 million.  That is because even if Norman himself only

saw the low end of the range he gave at trial – $6 million – the evidence is clear that millions of

additional dollars connected to the scheme were paid not to Norman but to his facilitators, and

they kept huge amounts of that money themselves.  *See* PSR at 25, 33, 35 (noting that Jeanne

Bowen took in at least $1.8 million and Noemi Dodakian took in at least $2.5 million).  For

instance, victim Cindi Owen testified that, when she and others made an initial $50,000

investment in the Jim Norman Program, the money was wired to Dodakian, and when she made

a subsequent investment in the program, she wired $75,000 to Bowen.  (Tr. 60, 104).  While

some of the money paid to Bowen and Dodakian related to the Robert Ingram schemes, and not

to the Jim Norman Program, it is reasonable to conclude that at least ¼ of what Bowen and

Dodakian received – which would be more than $1 million – related to the Norman Program, in

light of the evidence at trial reflecting extensive communications between Norman and Bowen

and Dodakian.  Accordingly, even using the low end of Norman's testimony – $6 million – when that number is combined with a conservative and reasonable estimate of victim money going to Bowen and Dodakian, the loss amount is above $7 million.

In addition, the bank records introduced at trial further support a finding that the loss amount is greater than $7 million.  As the Court will recall, the only bank records of Norman in the Government's possession (and introduced at trial) were Norman's RBC Centura records from December 2002 through March 2005.  In March 2005, RBC Centura shut down Norman's account (due to, according to Norman, "repeated debit card transactions" (Tr. 835)), and he moved his banking elsewhere.  Thus, the time period covered by the RBC Centura records reflected only a small snapshot of the active period of Norman's fraud scheme, as that scheme did not start in earnest until the fall of 2004.  Nevertheless, the RBC Centura account showed a total of $2,114,997 in inflows.  (GX 327, 328).  Between January 2004 and March 2005 (when the bank shut down the account), the account took in $1,856,242, mostly from large wire transfers in even dollar amounts.  (*Id.*).  Based on the victim testimony at trial, and the names and size of the wire transfers as reflected in GX 328, the Court can reasonably conclude that all, or nearly all, of these incoming wire transfers represented payments from victims.  Such a conclusion is also consistent with Norman's testimony.  Norman stated that from 2001 to 2003, he was "basically broke" as he "worked on this project."  (Tr. 830-31).  Thus, it was in 2004 when Norman began receiving the bulk of his victims' money.[1]

---

[1] Norman argues that the Court cannot conclude from the bank records that all of the funds received into the RBC account are scheme-related.  (Norman Br. at 8).  However, Norman testified on cross-examination that, other than income generated through his scam, he did not earn any other income during this time period.  (Tr. 831).  Accordingly, the Court can easily conclude by a preponderance of the evidence that the majority of transfers into Norman's RBC account are losses related to his fraudulent scheme.

As noted, however, the RBC account reflects Norman's bank records for only a small portion of the time that he was scamming victims out of the their money.  Norman testified that after the account was closed in March 2005, people continued to wire money to him, to his accountant John Bailey, and to the U.S.-based facilitators of the Jim Norman Program.  (Tr. 836).  Since Norman was arrested in Canada over 3½ years after the RBC Centura account was shut down, the Court can conclude that for at least 3½ additional years after March 2005, victims continued to pay money into the Jim Norman Program.  While the pace of those transfers likely slowed down toward the end of 2006, when many of Norman's victims had started turning against him, it is reasonable to conclude that Norman raised at least an additional $5 million between April 2005 and his arrest (and, as the Court knows, Norman continued to raise money from prison, even after his arrest).  The RBC Centura records show that in the 5-month period from November 2004-March 2005, Norman was paid more than $1.6 million.  (GX 327, 328).  At that rate, Norman would have raised an additional $5.4 million (for a total of more than $7 million) during the 17-month period from April 2005 through September 2006, when Norman told the CI he had brought in "really, not bragging, 9 million."  (GX 522).

Accordingly, the RBC Centura records are consistent with Norman's testimony and the evidence related to Norman's use of facilitators, which all reasonably indicate that the actual loss caused by, and foreseeable to, Norman was greater than $7 million.  *See* U.S.S.G. § 2B1.1(b), app. note 3.C ("The court need only make a reasonable estimate of the loss," and can base its estimate on, among other factors "[t]he approximate number of victims multiplied by the average

loss to each victim" and "the scope and duration of the offense and revenues generated by similar operations.").[2]

          **B.**     *Norman's Scheme Involved Between 50 and 250 Victims*

The Government established at trial that Norman's scheme involved at least 100 victims. Accordingly, the Court should follow the Probation Office's recommendation and enhance Norman's base offense level by four levels pursuant to U.S.S.G. § 2B1.1(b)(2)(B).

Government Exhibit 328, introduced at trial, is a summary of all wire transfers to and from Norman's RBC Centura account between December 2002 through March 2005. (Tr. 619; GX 328). The chart lists approximately 150 wire transfers into Norman's account during this period, nearly all of which were from individuals or business entities, and in large, even-numbered dollar figures indicative of Norman's fraud scheme. As noted above, during the time period of Norman's scheme, he was not otherwise legitimately employed. Accordingly, there is no non-nefarious explanation for these wire transfers into Norman's account, and the Court can reasonably conclude that each of these wire transfers was from a victim of Norman's scheme. In addition, Norman was asked at trial how many people in the United States sent him money. He responded, "Probably more than a hundred," further bolstering the Court's basis for concluding that Norman's victims numbered between 50 and 250. (Tr. 833).

In his submission, Norman argues that the Government identified only 13 victims at trial through testimony, and cannot rely on its exhibits to show that there were, in fact, more than 13

---

[2] In his submission, Norman requests that the Court grant an evidentiary hearing on loss amount. (Norman Br. at 9). The Government submits that a hearing on this issue is unnecessary. As set forth above, the Court can conclude based on evidence already in the record that Norman is responsible for a loss amount of more than $7 million, and defense counsel cites no additional relevant facts that could be adduced at a hearing.

victims of the Jim Norman Program.  (Norman Br. at 10).  In particular, Norman contends that some of the transfers into Norman's account may not have been from victims, but instead from friends or from entities controlled by Norman himself.  While it is true that a small number of the wire transfers into Norman's account shown in Government Exhibit 328 are from, for instance, "Thrum Records" (Norman's recording company), there were still well over 50 separate transfers from individuals or entities that were not affiliated with Norman – and as noted above, this chart represents only a limited snapshot of Norman's victims, as his scheme continued for several years after the RBC Centura account was shut down.  Since Norman had no legitimate reason to accept wire transfers from individuals he did not know – and because he admitted at trial he had taken money from over 100 individuals – the Court can and should easily conclude by a preponderance of the evidence that Norman's scheme had well over 50 victims, and accordingly the four-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(B) should be applied.

> ### C.     *Norman's Scheme Was Conducted from Outside the United States*

The Probation Office increased Norman's base offense level by two, pursuant to U.S.S.G. 2B1.1(b)(10)(B) and (C), because the offense was committed from outside the United States and because it involved sophisticated means.  Norman does not dispute – nor can he – that the enhancement for committing the offense from outside the United States applies here, as Norman committed his fraud from Canada, and the evidence on that issue is uncontroverted.[3]

> ### D.     *An Enhancement for Norman's Leadership Role Is Appropriate*

---

[3] The Government also agrees with the Probation Office than an enhancement for sophisticated means pursuant to U.S.S.G. 2B1.1(b)(10)(C) would be appropriate for the reasons stated in the PSR.  (PSR ¶ 56 n.19).  The Court need not reach this issue, however, because an additional enhancement for sophisticated means is not appropriate where the Court has already applied a 2-point enhancement for conducting the offense from outside the United States.

The Probation Office applied a 4-level enhancement pursuant to U.S.S.G. § 3B1.1(a) because of Norman's leadership role in the offense.  (*See* PSR at 24, 31).  The Probation Office noted that a 4-point leadership enhancement was applied to the sentencing of Robert Ingram, and Probation views "Norman and Ingram as having played equal roles and having equal levels of culpability in their conspiracies."  (PSR at 31).  Norman suggests that he will oppose this enhancement.  (Norman Br. at 13).

The Government submits that the 4-point role enhancement plainly applies here.  Section 3B1.1(a) of the Guidelines provides that "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels."  U.S.S.G. § 3B1.1(a).  The application notes define "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.,* app. note 1.  In light of the evidence at trial, there can be no real dispute that Norman organized and led criminal activity involving five or more participants – namely, his facilitators (who principally included John Billingsly, Noemi Dodakian, Linda Palmer, and Jeanne Bowen), as well as his accountant, John Bailey, and an acquaintance, Ann Henshaw, both of whom received wire transfers from victims and then wired money overseas at Norman's direction.  As the evidence at trial showed, this was the Jim Norman Program – he was the one who set up the website and created the story about the guaranteed nature of the investments; he was the one who signed the promissory notes that led so many victims to invest; he was the one who recruited facilitators in the U.S. to raise money on his behalf and gave them his fraudulent script to find investors; and he was the one who used Bailey and Henshaw to help process payments for the

scheme, particularly once his own account was shut down.  For all of these reasons, the Government submits that the leadership role enhancement unquestionably applies.

### E.    Vulnerable Victim Enhancement

The Probation Office included a 2-point vulnerable victim enhancement pursuant to U.S.S.G. § 3A1.1(b)(1), based on Norman's fraudulent dealings with victim Cindi Owen, who ultimately lost her family home after Norman convinced her – after she had already invested $30,000 with Norman – to take out a $75,000 home equity loan to make yet another purportedly guaranteed investment in the Norman Program.  (PSR at 23-25).  At the time, Norman knew that Owen had no discretionary funds available, and that she had religious motivations for investing with him.  (*Id.*)  Norman also told Owen that her original investments were at risk and that she would lose that money – which Owen was desperate to recoup – if she did not take out the home equity loan.  (*Id.*)  The Probation Office concluded that this conduct shows that Norman knew or should have known that Owen was "unusually vulnerable" or "particularly susceptible" to Norman's criminal conduct, and accordingly that the Section 3A1.1(b)(1) enhancement should be applied.

The Government believes the applicability of this enhancement in this case is a close call, but in light of the Second Circuit's decision in *United States* v. *Dupre*, 462 F.3d 131 (2d Cir. 2006), the Government is not seeking application of the enhancement here.  Nevertheless, Norman's conduct toward Owen (and toward other victims of the offense), which was plainly egregious and designed to take advantage of people susceptible to this kind of investment fraud, is highly relevant to the Court's consideration of the Section 3553(a) sentencing factors, addressed in more detail below.

F.     *Obstruction of Justice*

Norman testified in his own defense at trial, and gave materially false testimony on numerous specific matters, including the origin of the Jim Norman Program, his relationship with a facilitator, his being sued by his credit union after he cashed a fraudulent check, and his willingness to solicit money from investors without significant financial means.  As set forth below, this false testimony warrants application of a two-point enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1.

1.     <u>Applicable Law</u>

Section 3C1.1 of the Guidelines mandates a two-level upward adjustment of the offense level if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense."  U.S.S.G. § 3C1.1.  This provision applies to a defendant who commits perjury, or who provides "materially false information to a judge or magistrate."  U.S.S.G. § 3C1.1, app. notes.4(b) and (f).  Perjury occurs when a witness "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  *United States* v. *Dunnigan*, 507 U.S. 87, 94 (1993); *see also United States* v. *Stephens*, 369 F.3d 25, 26-27 (2d Cir. 2004).  The commentary to Section 3C1.1 defines "material" as "evidence, fact, statement or information that, if believed, would tend to affect or influence the issue under determination."  U.S.S.G. § 3C1.1, app. note 6.  Before imposing an adjustment for obstruction of justice, the sentencing court must find that the defendant "'consciously act[ed] with the purpose of obstructing justice.'"  *United States* v. *Case*, 180 F.3d 464, 467 (2d Cir. 1999) (quoting *United States* v. *Stroud*, 893 F.2d 504, 507 (2d Cir. 1990)); *see*

*also United States* v. *Reed*, 88 F.3d 174, 177-78 (2d Cir. 1996).  In doing so, the court must

"review the evidence and make independent findings necessary to establish a willful impediment

to or obstruction of justice, or an attempt to do the same."  *Dunnigan*, 507 U.S. at 95; *see also,*

*e.g.*, *Case*, 180 F.3d at 467; *United States* v. *Walsh*, 119 F.3d 115, 121 (2d Cir. 1997).

   In its findings, the sentencing court need not exhaustively parse the evidence, nor must

the court "recite any magic words to assure that [it has] applied the appropriate standard."

*Walsh*, 119 F.3d at 121.  Rather, "[w]here the district court finds that the defendant has 'clearly

lied' in a statement made 'under oath,' the 'court need do nothing more to satisfy *Dunnigan* than

[1] point to the obvious lie and find that the defendant [2] knowingly made a false statement on

[3] a material matter.'"  *United States* v. *Lincecum*, 220 F.3d 77, 80 (2d Cir. 2000) (quoting

*United States* v. *Williams*, 79 F.3d 334, 337-38 (2d Cir. 1996)).  The court may draw all

reasonable inferences both from the words used and all of the relevant circumstances. *See Reed*,

88 F.3d at 179 (court should "view the facts not piecemeal but in conjunction" in determining

whether conduct was obstructive); *United States* v. *Shoulberg*, 895 F.2d 882, 885-86 (2d Cir.

1990).  For sentencing purposes, perjury need only be proved by a preponderance of the

evidence.  *See* U.S.S.G. App. C, Amend. 566 (Nov. 1, 1997); *see also United States* v. *Khedr*,

343 F.3d 96, 102 (2d Cir. 2003); *United States* v. *Menting*, 166 F.3d 923, 929 (7th Cir. 1999).

   An upward adjustment for obstruction of justice is "mandatory once its factual predicates

have been established."  *United States* v. *Ruggiero*, 100 F.3d 284, 292 (2d Cir. 1996) (citations

and internal quotation marks omitted); *see also Dunnigan*, 507 U.S. at 98; *United States* v.

*Mylett*, 97 F.3d 663, 668 (2d Cir. 1996); *United States* v. *Shonubi*, 998 F.2d 84, 88 (2d Cir. 1993)

(district court erred as a matter of law in declining to enhance sentence after having found factual predicate for obstruction of justice).

2.      <u>Norman's Perjury at Trial</u>

Norman's testimony at trial included a series of plainly false statements that were made with the evident intent to evade responsibility for his own wrongdoing.  He lied in broad ways – such as his insistence that he believed that "Mrs. T" truly worked for the IMF and that "Fred Bolta" truly worked for the World Bank, despite overwhelming evidence, of which he was well aware, that they did not.  Norman also lied in at least five more specific ways: first, he told lies about the beginning of the Jim Norman Program; second, he lied about his relationship with one of his facilitators, Noemi Dodakian; third, he lied about what happened in 2005 when he cashed a forged check at a credit union for 500,000 Euros; fourth, he lied about the money that he paid to Ann Henshaw; and fifth, he lied about not soliciting from investors in "dire" financial situations.  Each of these lies was willful and material in light of the other evidence in the case, and accordingly each is grounds for imposing the obstruction enhancement.

a.      *Lies About How the Jim Norman Program Started*

In his direct testimony, Norman told the jury that the Jim Norman Program began when two brothers from the Ivory Coast named David and Desmond communicated with him over email and phone and told him that they wanted to move $17.4 million and $12.4 million out of Africa, respectively, and needed Norman's help.  (Tr. at 687, 695).  Norman admitted to sometimes confusing which brother was which, and the testimony is not clear as to which brother first purportedly approached Norman.  (Tr. at 689, 695).  Norman then said that a third individual named Ambrose Lewis, who was the "security manager" for David and Desmond, contacted him

and offered to put an additional "portfolio" of $68 million into Norman's name in order to move those funds out of Africa.  (Tr. 696).  According to Norman, at some point in 2003 or 2004 all three of these accounts were combined into one account in his name at the World Bank, and by 2004, with accumulated interest, the value of the World Bank account had grown to more than $150 million.  This story was important, because evidence at trial showed that beginning at least in late 2004, Norman was telling victims such as Gregory Rodriguez and Karl Meyers that *he* – Jim Norman, not David, Desmond or Ambrose Lewis – had an account at the World Bank with more than $150 million in it, and the money in the account would be released to Norman if certain fees were paid.

Norman's origin story was an obvious lie – and during his testimony, he could not keep the details straight, or prevent it from collapsing due to its own inconsistencies.  For example, Norman first testified that Ambrose Lewis was simply the "security manager" for David and Desmond, and "I don't think he is a family member."  (Tr. at 862).  But when confronted with his testimony at a prior proceeding in which Norman referred to Ambrose Lewis as being part of the same family as David and Desmond, Norman said: "What I heard really is he [Lewis] was a cousin."  (Tr. 892-93).  Pressed to explain, Norman stated that he heard from an attorney in Ghana that David and Desmond "were from a polygamous[] father [who] had more than one wife and they were a cousin."  (Tr. at 893).  The Court can fairly conclude that Norman was making it up as he went along.

More significantly, one of the emails that Norman relied upon in his direct testimony that he said came from Fred Bolta of the World Bank directly contradicted Norman's entire origin story.  The email – Defense Exhibit H – purports to show that the three accounts from David,

Desmond and Ambrose Lewis were finally being wire transferred out of the Ivory Coast and combined into one account. (Tr. at 865). But the email was dated June 22, 2005 – nearly 18 months *after* Norman had been telling victims that more than $150 million was already in his account at the World Bank in Geneva. (*Id.*)

b.      *Lies About His Relationship with Noemi Dodakian*

In his direct testimony, Norman tried to distance himself from Noemi Dodakian, who was one of his key facilitators. When asked who she was, Norman replied, "Emi Dodakian worked for Jeanne Bowen. I never knew her other than, occasionally, she would be on the phone with me." (Tr. at 697). On cross examination, Norman confirmed that this was his testimony. (Tr. at 929-30). This testimony was important because Dodakian raised huge amounts of money for Norman, and explicitly used people's religion to convince them to invest – while Norman insisted that he did not use religion in that way. (Tr. at 729). But the evidence is clear that Norman worked far more closely with Dodakian than he was letting on. Norman admitted as much after being confronted with Dodakian's phone records, which showed hundreds of calls between Dodakian and Norman, and bank records showing that Dodakian wired more than one hundred thousand dollars directly to Norman. (Tr. at 930-31).

c.      *Lies About The Forged Check Episode*

In May 2005, Norman cashed a check for 500,000 Euros at his local credit union, and then used a significant portion of that money to buy himself a $180,000 Porsche Cayenne SUV with a souped-up sound system and a $6,500 roof rack. When the credit union realized the check was a fraud, it sued Norman and won an injunction against his finances, and Norman was also required to give back the Porsche.

In his direct testimony, Norman denied being sued by the credit union: "I don't think I was sued.  I was just given an injunction which mean[s] I couldn't function until these funds were replaced in the credit union.  I wasn't sued, I don't think."  (Tr. 720).  Norman also testified that, after the injunction was put in place, he used his account at RBC Centura to continue to send funds overseas as part of his program.  (Tr. at 721).  He also testified that the injunction "limited the ability to earn a living."  (Tr. at 723).  Nearly all of this testimony was false. Norman had in fact been sued by the credit union, and summary judgment was granted against him (Tr. at 944); at the time this incident occurred, Norman's account at RBC Centura had already been shut down (*id.*); and Norman admitted he had not been "earn[ing] a living" for years, regardless of the injunction.  (Tr. at 944-45).

d.      *Lies About Money Going To Ann Henshaw*

In its case-in-chief, the Government presented evidence showing that Norman wired tens of thousands of dollars to Ann Henshaw, who had a personal relationship with Norman.  (Tr. at 844).  On direct examination, Norman tried to minimize the importance of these wire transfers. He stated that "There were people that knew my account[] in Toronto was not accessible, there was an injunction against it.  So Ann, John Bailey, etc., allowed their accounts to be used where funds raised would go in and go out."  (Tr. at 766; *see also* Tr. at 846-47).  Norman further testified that upon his instructions, Henshaw would wire money from her account to other accounts in order to "pay a fee."  (Tr. at 766).  This testimony was important because Norman was trying to deny that he – or people with whom he had a personal relationship, like Henshaw – benefitted financially from the fraud.  (Other similar instances in his testimony include referring to the Porsche Cayenne that he purchased as nothing more than buying himself "some

transportation" (Tr. at 938); dismissing the tens of thousands of dollars he spent on clothing as assisting the "appearance of Espavo" (Tr. at 849); and explaining a $2,300 hotel room as an effort "to be comfortable" (Tr. at 852).)  In fact, however, the wire transfers from Norman's account to Henshaw took place well before the injunction against his accounts was imposed following the fraudulent check episode, and before Norman's RBC Centura account was shut down in March 2005.  (Tr. at 846, GX 327).  Accordingly, Norman's stated reasons for the transfers to Henshaw were bogus.

e.      *Lies About Not Soliciting Victims Who Were In Dire Financial Situations*

On direct, Norman was asked: "at any point in time did you ask individuals to borrow monies from institutions knowing that they were in dire financial situation?"  Norman replied: "No.  I was actually opposed to that."  (Tr. at 729).  This testimony was significant because on a recorded call with victim Cindi Owen, Norman told Owen that investors were not supposed to have been solicited if they did not have discretionary income to spare.  (Tr. at 922, GX 140).  On cross examination, Norman repeated the same sentiment:

> Q. No one was ever supposed to be asked for money that wasn't discretionary income?
>
> A. Discretionary income or comfortable with or willing to lose or all those kinds of terms.  In other words, you don't go and gamble with your kids' tuition.  That is really what is being said.

(Tr. at 922).

These statements were plainly false.  Evidence at trial showed that Norman repeatedly solicited investors with no money to spare – including Cindi Owen, who told Norman she had no discretionary income and would have to take a line of credit out on her house; Ernest Yoder, who told Norman he was using his family's wedding budget to invest; Lara Rogers, who told Norman

-19-

she was effectively broke before sending him $12,000 at his request; and Marchel Kelley, who Norman knew had lost her job and sold her truck in order to invest with Norman.  (Tr. at 924-27).

Each one of these instances of perjured testimony, by itself, would be sufficient to apply the obstruction enhancement.  Combined, they reveal a defendant willing to say almost anything in order to absolve himself of any responsibility for his conduct.

## II.    Application of the Sentencing Factors Pursuant to Section 3553(a)

### A.    *Nature and Circumstances of the Offense*

Following calculation of the applicable Guidelines range, the Court must take into account the factors set forth in 18 U.S.C. § 3553(a) before imposing sentence.  The first factor referenced by that statute is the need to take into account the "nature and circumstances of the offense."   18 U.S.C. § 3553(a)(1).

As the Court observed from the testimony and exhibits introduced at trial and from other proceedings in the case, the offense that Norman committed was extremely serious. Norman victimized dozens of people who lacked sophistication in financial matters, and who were tricked into trusting Norman and other co-conspirators with their limited savings.  In virtually daily emails and conference calls in 2005 and 2006, Norman's "facilitators," joined on the calls by Norman himself, portrayed themselves as experienced investors with whom the victims' money would be safe, and with exorbitant returns 100% guaranteed.  Norman and his facilitators repeatedly extracted more money from victims who had already given money through promises that payoffs were just around the corner.

Norman's crime was financially devastating for many of his victims.  Cindi Owen testified at trial that, as a result losing the $90,000 she invested with Norman, she and her husband lost their home in Colorado.  (Tr. 117).  Gary Title testified that he lost money that he took out of his own home equity line of credit – money that was important to him.  (Tr. 256).  Lara Rogers, who gave Norman a total of $30,000, ultimately had to file for bankruptcy when she never received any of her money back.  (Tr. 322).  Gregory Rodriguez lost his chiropractic clinic as a result of Norman's fraud.  (Tr. 388).  Karl Meyers, a veteran, ended up homeless.  Of course, these are only a subset of the people whose financial stability was irreparably damaged by Norman's crime.

Just as bad as the financial devastation inflicted by Norman was the harm caused by his abuse of the trust that so many had placed in him.  Victims such as Cindi Owen were persuaded to invest in large part based on Norman's representation that he shared their values.  For instance, it was important to Owen that she spoke directly with Norman before she invested $75,000.  Owen remembered her conversation with Norman as follows:

> That was a really good call we had with Jim Norman.  He was very upbeat and very charismatic and just a really nice person on the phone.  He shared with us his philanthropic and his humanitarian projects that he had going through the Espavo Foundation.  He told us that he was working to build orphanages around the world and this was something that was very dear to me to be a part of since we had a tied with children in Haiti.  It was just a really positive call that we had, and it really made us want to be a part of helping him to assist him to free up all these funds that were unfortunately tied up to him.

(Tr. 95).  Owen also testified that, as part of the Jim Norman Program, she would participate in weekly prayer calls with Dodakian.  These calls were important to Owen because, as she

testified, they made her feel good about the Jim Norman Program because it "was based on faith and beliefs" and she was involved with like-minded people.  (Tr. 69).

Norman and his facilitators deployed the lie that programs she offered would help the public and do good in the world, preying on their victims' desire to help others while helping themselves.  Dodakian and other facilitators organized conference calls in which they facilitated prayers for return of funds, even while Norman continued to receive and spend more funds from victims who were unaware of the promises he had broken to earlier victims of his scheme. Norman's efforts to prey on others' faith in order to maximize the amount of money he could extract from his victims, and to dissuade them from contacting authorities, makes his conduct particularly egregious.

### B.    History and Characteristics of the Defendant

The Court also must consider the "history and characteristics of the defendant" when imposing sentence.  18 U.S.C. § 3553(a)(1).  Norman's counsel highlights Norman's life as a musician and lack of prior criminal conduct.  But that prior life must be considered in the context of the multi-year fraud scheme that became Norman's business and sole source of income for many years.  Moreover, when considering Norman's character, it must be noted that he has manipulated others and violated the law year-after-year since at least 2004; he continues to deny responsibility for the devastation he caused his victims; and he has shown no remorse or sympathy to his victims, even after learning how their lives have been destroyed.  Finally, Norman's efforts to obstruct justice at trial by perjuring himself on the witness stand further demonstrate that among his characteristics are a dangerous ability to lie without hesitation or

remorse, and to rationalize criminal conduct (perjurious testimony) with a belief that it would

serve some greater good (his acquittal at trial).

> C.    *The Purposes of Sentencing, Including Need To Protect Public From Further Crimes of the Defendant*

The Court must also consider the need to "impose a sentence sufficient, but not greater

than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law,

and to provide just punishment for the offense;

> (B)    to afford adequate deterrence to criminal conduct;

> (C)    to protect the public from further crimes of the defendant; and

> (D)    to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Each of the first three purposes of sentencing set forth in Section 3553(a)(2) counsel in

favor of a significant sentence.[4]

---

[4] Norman seeks a reduction in the sentence to be imposed by the Court in order to give him extra credit for the conditions of his pre-extradition detention in Canada.  (Norman Br. at 3-4, 15-17). The Government notes, however, that the conditions in Canada do not appear to match the level of conditions faced by defendants in which a downward departure under the Guidelines could have been or was warranted.  *See, e.g.*, *United States* v. *Carty*, 264 F.3d 191, 193 (2d Cir. 2001) (small cell without light and housing several inmates; 10-15 minutes per day outside of cell; no running water); *United States* v. *Mateo*, 299 F. Supp. 2d 201 (S.D.N.Y. 2004) (defendant sexually harassed by prison guard and was forced to give birth in prison without proper medical attention).  Moreover, the Court should not discount Norman's sentence to reflect time he spent in Canada while fighting extradition.  By statute, credit will automatically be given by the BOP for the time Norman has served in official detention prior to the date of sentencing, at least where, as here, there is no possibility that the detention was attributable to another offense.  This rule is set forth in Title 18, United States Code, Section 3585(b), which reads, in relevant part: "(b) Credit for Prior Custody. - A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence

Norman's defense at trial was that he was a believer in the Jim Norman Program; that to the extent there was a fraud, he too was a victim, just like Cindi Owen.  Unbelievably, however, even after Norman sat through the entirety of the Government's case, after he heard from representatives from the IMF and World Bank that there is no fund, and that the Jim Norman Program is a scam, he still professed to "emphatically" believe in the project.  (Tr. 829).  In fact, he testified that he had worked on his project as early as that very morning – presumably from the MCC, where he was incarcerated.  (*Id.*).  Even worse, even up through his trial in this matter – after he had been charged, arrested, extradited from Canada, and his co-conspirators convicted and sentenced – Norman was still soliciting money from victims.  For instance, Marchel Kelley, an unemployed artist with nearly $100,000 in credit card debt who testified on Norman's behalf, stated that as recently as a few weeks before her testimony in this matter she had sent money to Norman.  (Tr. 649, 659).  Finally, as the Government alerted the Court at the conclusion of trial, *during* the trial in this matter, Jim Norman was using his MCC email account to continue to solicit money from victims, including Ms. Kelley.

Norman continues to profess his belief in the Jim Norman program, is still soliciting money from victims, and refuses to accept responsibility for his crimes.  A lengthy sentence is therefore appropriate in this case to specifically deter Norman from continuing to commit fraud

---

commences - (1) as a result of the offense for which the sentence was imposed . . . that has not been credited against another sentence."  It is the Government's understanding that the BOP applies Section 3585(b) to time spent in custody as a result of the offense at issue (as is the case here), regardless of whether such detention was in a foreign country.  Accordingly, while the Government would not oppose a request by Norman that the Court recommend that the BOP credit him for the time he spent in prison in Canada prior to extradition, the Government believes it would be inappropriate for the Court to reduce the overall sentence imposed on Norman on those grounds.

offenses and, perhaps more importantly, to protect the public from his crimes.  18 U.S.C. § 3553(a)(2).

## <u>Conclusion</u>

For the reasons set forth above, the Government respectfully submits that the applicable Guidelines range is 240 months' imprisonment, and that a sentence at that range is appropriate here in light of the purposes of sentencing.

Dated: July 5, 2013
　　　　New York, New York

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By:　　　/s/
　　　　Andrew Goldstein & Andrea Surratt
　　　　Assistant United States Attorneys
　　　　212-637-1559

cc:　　Megan Wolfe Benett, Esq.,